**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CHRISTIE L. NAFZIGER,

                Plaintiff,

v.                                       Case No. 8:19-cv-02511-T-35TGW

GOSPEL CRUSADE, INC.,               **DISPOSITIVE MOTION**

                Defendant.

_____/

**DEFENDANT/COUNTER-PLAINTIFF, GOSPEL CRUSADE, INC.'s MOTION FOR**
**SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Defendant/Counter-Plaintiff, Gospel Crusade, Inc. ("Defendant"), pursuant to Rule 56, Federal Rules of Civil Procedure, moves the Court for summary judgment against Plaintiff/Counter-Defendant, Christie L. Nafziger, upon the grounds that the summary judgment evidence filed in this action establishes that there is no genuine issue as to any material fact and that Defendant is entitled to summary judgment as a matter of law.

**I.     INTRODUCTION**

Plaintiff filed a six-count Amended Complaint (the "Complaint") against the Defendant alleging retaliation under Title VII of the Civil Rights Act ("Title VII") (Count I) and the Florida Civil Rights Act ("FCRA") (Count II), sex discrimination under the FCRA (Count III) and Title VII (Count IV), marital status discrimination under the FCRA (Count V), and assault (Count VI). [Dkt. 30]  Defendant filed a Counterclaim (the "Counterclaim") against the Plaintiff alleging violation of the Florida Security of Communications Act.  [Dkt. 32]  As discussed below, the record evidence establishes there is no genuine dispute of material fact.  Defendant is entitled to summary judgment in its favor on all counts of the Complaint and on Defendant's Counterclaim as to liability.

## II.       UNDISPUTED MATERIAL FACTS

Founded in 1955, Defendant operates an evangelical Christian church in Bradenton, Florida.[1]  [P. Derstine Decl. ¶ 5; Pl. Dep. 46:13–47:14; Dkt. 30 ¶ 4]  In addition to other religious activities, Defendant performs more than 400 religious services a year and conducts mission work throughout the world.   [P. Derstine Decl. ¶ 7; Pl. Dep. 52:24–53:1]   Defendant's overarching mission is to teach Kingdom of God principles and help Christians learn how to share Christ's love, joy, and peace through the power of the Holy Spirit.  [P. Derstine Decl. ¶ 8] At all relevant times, Pastor Phil Derstine was the head pastor of Defendant's church and also its president.  [Derstine Dep. 11:22–24; P. Derstine Decl. ¶ 9; Pl. Dep. 53:2–5]  Plaintiff was a member of Defendant's church congregation and also an employee of the Defendant.[2]  [P. Derstine Decl. ¶ 10; Pl. Dep. 53:6–15]

As a vital part of its evangelical mission, Defendant creates video content to spread its religious message, promote its church activities, attract new church congregants, and broadcast on the Christian Television Network.  [P. Derstine Decl. ¶ 12; Dkt. 30 ¶ 18; Pl. Dep. 94:10–95:16]  Plaintiff was employed as Defendant's only video producer.[3]  [Derstine Dep. 26:21–25; P. Derstine Decl. ¶ 13; Pl. Dep. 89:18–23]   As Defendant's video producer, Plaintiff was entrusted with capturing raw video footage of the church's various activities and using her discretion in editing and otherwise assembling the footage in such a way as to best convey the

---

[1] Defendant is recognized by the Internal Revenue Service as a 501(c)(3) tax-exempt organization organized and operated exclusively for religious purposes.  [P. Derstine Decl. ¶ 6; Pl. Dep. 46:13–18]

[2] Until her termination in January of 2019, Plaintiff had been employed by Defendant for approximately 10 years and had volunteered for Defendant for approximately five years prior to her employment.  [P. Derstine Decl. ¶ 10; Pl. Dep. 12:1, 218:24–219:1]

[3] Plaintiff also performed some accounting and other administrative services for Defendant.  [P. Derstine Decl. ¶ 13; Pl. Dep. 81:22–82:18]

church's religious message in the final publication. [P. Derstine Decl. ¶ 14; Pl. Dep. 85:9–93:11, 94:10–95:16]

For example, in creating the church's "Purpose for Life" videos for the Christian Television Network, Plaintiff chose the subject sermon, decided which parts of the sermon to include and exclude, and edited the final product so that the final video would convey the church's religious message while still making sense. [Pl. Dep. 71:25–74:8] Plaintiff also created her own commercials for these videos in which she personally promoted the Defendant's church events, always making sure to consider her audience when doing so. [*Id.* at 74:14–76:6]

Plaintiff also played an instrumental role in creating videos from the Defendant's youth church camps, which were played for the church's congregants, the camp attendees and their parents, prospective church camp attendees, and on the Christian Television Network. [Pl. Dep. 95:17–101:7, 58:5–9] Among other things, Plaintiff would interview camp attendees (including scripting the questions), select which interviews to put in the video, assemble the interviews with corresponding images to create a theme, and choose audience-appropriate Christian music for the video. [*Id.* at 99:11–101:7] Plaintiff also created similar videos promoting the church's mission work [*Id.* at 105:7–17], its Institute of Ministry [*Id.* at 105:25–107:3], Feast of Tabernacles [*Id.* at 102:16–103:25], and Women's Conference [*Id.* at. 113:14–114:9]. Like the church camp videos, these videos were also played for the church's congregants and to the general public to bring in new congregants. [*Id.* at 105:12–17, 105:25–106:7, 103:10–25, 114:4–9] Plaintiff spent a significant amount of time creating her videos, working long days and sometimes all night. [*Id.* at. 96:17–20, 103:8]

As the Defendant's video producer, Plaintiff played a pivotal role in the church's mission. [P. Derstine Decl. ¶ 15] When Plaintiff applied for the position, she advised the

Defendant that her objective was to "support ministry endeavors and spread the Gospel." [P. Derstine Decl. Ex. B]  Plaintiff was also a graduate of the Defendant's "Institute of Ministry"—a 10-week scripture-based religious education program that the Plaintiff described in her job resume as having provided her "with a firm foundation in the person and nature of God." [Pl. Dep. 108:14–109:7; Derstine Dep. 33:3–16; P. Derstine Decl. Ex. B]  Plaintiff described the Institute of Ministry as having been a "turning point" in her life and that it had made her a "sign to others." [Pl. Dep. 191:22–193:4; https://vimeo.com/162027678]  In performing some of her public-facing work as the church's video producer, the Plaintiff wore a name tag identifying herself as the "Media Ministry." [P. Derstine Decl. ¶ 18; Pl. Dep. 113:3–6]  Plaintiff also held herself out to the public as an "Able Minister" for the Defendant. [Pl. Dep. 191:2–15; Pl. Dep. Ex. 15]  Further, Plaintiff attended bi-weekly Managers' meetings and Church Staff meetings for the Defendant where she helped manage the church's funds and plan the Defendant's many church events. [*Id.* at 54:1–57:13, 58:22–5921]  She also helped create the church's Communications Department and attended Communications Department meetings where she assisted in planning how the church would promote its various religious activities to its congregants and the general public. [*Id.* at 60:16–62:17]

On or around August 22, 2017, Defendant hired Dr. Ulette Song[4] to serve as pastor along with Pastor Phil Derstine. [P. Derstine Decl. ¶ 19]  Thereafter, Pastor Ulette Song and the Plaintiff began to have issues with their marriages, Plaintiff's performance began to suffer, and in or around July of 2018, Defendant twice counseled Plaintiff regarding her job performance and attendance. [P. Derstine Decl. ¶ 20–21; Pl. Dep. 66:22–67:19, 70:1–23; Cole Decl. ¶ 5]

On August 2, 2018, Pastor Ulette Song's then-husband, Tony Bonner and son, Daniel Bonner entered the Bonner family home with their key and found the Plaintiff and Pastor Ulette

---

[4] Dr. Song's last name at the time was "Bonner." [Pl. Dep. 78:18–21]

Song in bed together.  [Pl. Dep. 153:13–155:23]  A verbal altercation ensued, with Daniel

Bonner appearing to record the events on his cell phone.  [*Id.* at 154:2–156:23]  Neither Tony

Bonner nor Daniel Bonner was an employee of the Defendant at the time of the August 2, 2018

incident.  [Derstine Dep. 36:24–37:24; P. Derstine Decl. ¶ 23; Pl. Dep. 78:3–79:1, 161:12–14,

178:15–19]  Defendant did not instruct Tony Bonner or Daniel Bonner to enter the Song home

on August 2, 2018 or to videotape the incident.  [Derstine Dep. 40:2–7; P. Derstine Decl. ¶ 24;

Pl. Dep. 159:1–14]  Defendant has not received or viewed any recording that Tony Bonner or

Daniel Bonner might have taken on August 2, 2018.  [Derstine Dep. 43:22–23; P. Derstine Decl.

¶ 25; Pl. Dep. 157:1–6, 157:22–25]  In fact, Defendant had no knowledge of the August 2, 2018

incident until Pastor Ulette Song informed Defendant of the incident after it had occurred.

[Derstine Dep. 40:2–7; P. Derstine Decl. ¶ 26]

On August 22, 2018, Plaintiff requested 10 days of vacation time to travel with Pastor

Ulette Song to Africa for a mission trip.[5]  [P. Derstine Decl. ¶ 27; Pl. Dep. 133:18–134:6; Pl.

Dep. Ex. 7]  Defendant granted Plaintiff's request for time off, and Plaintiff was to return to

work on September 10, 2018.  [Pl. Dep. 134:1–8; Pl. Dep. Ex. 7; P. Derstine Decl. ¶ 28]  Prior to

leaving for the mission trip, Plaintiff informed her stepmother, Ann Leonard that Defendant had

counseled her about performance issues.  [Pl. Dep. 138:9–139:14]  However, despite knowing

that the Defendant was disappointed with her performance and needing her to produce more

videos, Plaintiff left for Africa with Pastor Ulette Song.  [*Id.*]

On September 10, 2018 (the day Plaintiff was required to return to work), Plaintiff

emailed the Defendant and advised that she would not be returning to work until November and

that the Defendant could reevaluate her position upon her return.  [Pl. Dep. 134:16–135:15; P.

---

[5] The mission trip was not part of Plaintiff's required job duties with the Defendant.  [P. Derstine Decl. ¶ 27; Pl.
Dep. 125:12–14]

Derstine Decl. ¶ 29; Pl. Dep. Ex. 8]  In response, Defendant reiterated that the Plaintiff's work performance had been suffering, stated that the Plaintiff had been counseled several times regarding her performance, and informed the Plaintiff that the Defendant would need to consider replacing her.  [Pl. Dep. 135:16–136:15; P. Derstine Decl. ¶ 30; Pl. Dep. Ex. 8]  Plaintiff received Defendant's response but chose to remain in Africa and not return to work.  [Pl. Dep. 136:16–137:17]

Plaintiff returned to the United States from Africa on November 17, 2018.  [Pl. Dep. 142:3–6]  However, instead of reporting to work, Plaintiff decided to take more unapproved vacation time to visit her family in Indiana.  [*Id.* at 142:7–19]  Plaintiff and Pastor Ulette Song did not report to work until November 30, 2018.  [*Id.*; P. Derstine Decl. ¶ 31]  After having been approved for just 10 days of vacation, Plaintiff failed to report to work for nearly three months.  [Pl. Dep. 143:10–14; P. Derstine Decl. ¶ 32]

When the Plaintiff and Pastor Ulette Song returned to work on November 30, 2018, Pastor Ulette Song was terminated for job abandonment.  [Pl. Dep. 180:21–23; Derstine Dep. 21:22–25; P. Derstine Decl. ¶ 33]  Immediately thereafter, Plaintiff was also terminated for job abandonment.[6]  [Pl. Dep. 21:25–22:12; Derstine Dep. 21:22–25; P. Derstine Decl. ¶ 34]  However, as a second chance, Defendant re-hired the Plaintiff on an hourly basis.  [Pl. Dep. 146:1–18; Derstine Dep. 22:4–23:10, 24:1–19; P. Derstine Decl. ¶ 35]

Plaintiff's performance continued to suffer after she was re-hired on November 30, 2018.  [P. Derstine Decl. ¶ 36; Cole Decl. ¶ 5]  On Sunday, January 20, 2019, Plaintiff failed to report to work (Sunday service) on time despite knowing several days before there was a technical issue that needed to be corrected in order to record the Sunday service.  [Pl. Dep. 167:8–170:13;

---

[6] Plaintiff appears to contend that she was not terminated for job abandonment because Defendant never used the word "terminated," [Pl. Dep. 179:23–25], but she admits Defendant informed her that her position was eliminated due to job abandonment.  [*Id.* at 22:4–12]

P. Derstine Decl. ¶ 37; Pl. Dep. Ex. 14; Cole Decl. ¶ 5)  The technical issue was not resolved in time for the January 20, 2019 Sunday service, and for that reason Defendant was prevented from recording a DVD of the service and from being able to transmit a closed caption version of the service to congregants who were unable to attend.  [Pl. Dep. 167:8–23; P. Derstine Decl. ¶ 38]

Three days later, on January 23, 2019, the Defendant terminated the Plaintiff's employment.  [P. Derstine Decl. ¶ 39; Pl. Dep. 171:8–11, 204:14–16]  The termination meeting was held with the Plaintiff, Pastor Phil Derstine (Plaintiff's supervisor), and Jannette Derstine (an employee of the Defendant, the head of the technical department, and Plaintiff's marital counselor) in attendance.  [Pl. Dep. 171:8–13, 135:1–6, 170:24–171:2, 63:12–23; P. Derstine Decl. ¶ 40; J. Derstine Decl. ¶¶ 4–6]  During the termination meeting, Defendant discussed Plaintiff's continued poor performance since her re-hire.  [Pl. Dep. 172:2–17; P. Derstine Decl. ¶ 41; J. Derstine Decl. ¶ 7]  Defendant also indicated that Plaintiff was late to work for the January 20, 2019 Sunday service and that her late arrival prevented Defendant from recording the service.  [Pl. Dep. 172:19–25; P. Derstine Decl. ¶ 41; J. Derstine Decl. ¶ 7]  The entire meeting lasted over one hour, with the Plaintiff's termination occurring toward the beginning of the conversation.  [P. Derstine Decl. ¶ 42; J. Derstine Decl. ¶ 8]  After Plaintiff was terminated, the remainder of the conversation included pastoral guidance, and the meeting concluded with the Derstines and Plaintiff joining in prayer.  [P. Derstine Decl. ¶ 42; J. Derstine Decl. ¶ 8]

The January 23, 2019 termination meeting took place in Pastor Phil Derstine's office with the doors closed, and the Derstines believed the conversation would be private.  [Pl. Dep. 171:8–11, 171:18–20; P. Derstine Decl. ¶ 43; J. Derstine Decl. ¶ 9]  However, unbeknownst to Pastor Phil Derstine and Jannette Derstine, the Plaintiff secretly recorded the meeting without their knowledge or consent.  [Pl. Dep. 173:5–19; P. Derstine Decl. ¶ 44; J. Derstine Decl. ¶ 10]  The

Plaintiff then sent the recording to the Equal Employment Opportunity Commission ("EEOC"). [Pl. Dep. 175:8–10]

At no time prior to the Plaintiff's termination did the Plaintiff complain of any harassment or discrimination to the Defendant.  [Pl. Dep. 41:1–42:2; P. Derstine Decl. ¶ 45] Further, Plaintiff admits there were no similarly situated employees of the Defendant that were treated more favorably than her.  [Pl. Dep. 180:1–189:22]  Instead of complaining of harassment or discrimination, the Plaintiff testified she only "silently resisted" Pastor Phil Derstine's advice that she reorient her focus on her job and that she move in with her brother instead of Pastor Ulette Song.[7]  [Pl. Dep. 42:2, 67:14–20, 71:6–11; P. Derstine Decl. ¶ 46]

On March 11, 2019, Plaintiff filed a Charge of Discrimination ("Charge") with the EEOC.  [Pl. Dep. 15:3–5; Pl. Dep. Ex. 1]  In the Charge, Plaintiff did not check the box to indicate that the Defendant had engaged in any retaliation against her [Pl. Dep. 15:3–16:2; Pl. Dep. Ex. 1]  Plaintiff also did not include any allegations of retaliation in the narrative of her Charge.  [Pl. Dep. 16:17–17:6; Pl. Dep. Ex. 1]

On or about July 23, 2019, with assistance of counsel, Plaintiff completed an intake questionnaire for the Florida Commission on Human Relations ("FCHR").  [Pl. Dep. 35:11–16; Pl. Dep. Ex. 4]  The questionnaire form contained the following instruction:

> SPECIAL NOTE: **If today's date is within 21 days of required final filing date** (365 days [or 300 days for dual filing with EEOC] from date of alleged discrimination stated in item 2.b), I desire to submit this questionnaire as a formal complaint and authorize the Commission to fill out a formal complaint form and send to Respondent and provide a copy for me to sign and return immediately upon receipt.

---

[7]   While the Plaintiff claims she "silently resisted" Pastor Phil Derstine's advice to move in with her brother, Plaintiff instead repeatedly told Pastor Phil Derstine that she was going to move in with her brother.  In fact, in her sworn EEOC Charge of Discrimination, Plaintiff stated that "Respondent believed I would comply with their living conditions."  [Pl. Dep. Ex. 1; P. Derstine Decl. ¶ 46]

[Pl. Dep. Ex. 4 at 3 (emphasis in original)]   In the questionnaire, Plaintiff alleged that she was last discriminated against on January 30, 2019.  [*Id.* at 2]  The FCHR has no record of receiving any charge from the Plaintiff, has not contacted Plaintiff or in any other way responded to the questionnaire, and the Plaintiff has made no attempt to confirm receipt of the questionnaire or to follow-up.  [Pl. Dep. 45:2–46:12]

### III.   MEMORANDUM OF LAW

#### A. *Summary Judgment Standard*

Summary judgment is proper if the pleadings and summary judgment evidence on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  Once the Defendant successfully negates an essential element of the Plaintiff's' case, the burden shifts to the Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Celotex Corp.*, 477 U.S. at 322–23.  The Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, and a mere "scintilla" of evidence or conclusory allegations is insufficient.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Anderson* , 477 U.S. at 252; *Celotex Corp.,* 477 U.S. at 324.  "[T]here must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson,* 477 U.S. at 252.  The Eleventh Circuit has consistently held that conclusory allegations without specific supporting facts have no probative value and are legally insufficient to defeat summary judgment.  *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

### B. *Counts I through V Are Barred by the* **Hosanna-Tabor** *Exception.*

Plaintiff's employment discrimination and retaliation claims are barred by the *Hosanna-Tabor* exception. The First Amendment of the United States Constitution prohibits courts from intruding on internal church decisions affecting the faith and mission of the church. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2062 (2020). Consequently, the United States Supreme Court has recognized a rule now known as the *Hosanna-Tabor* exception.[8] *Id.* at 2060 (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012)). "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. A plaintiff whose position falls within the *Hosanna-Tabor* exception is therefore barred from pursuing employment discrimination and retaliation claims against her employer. *See id.* at 2055.

In determining whether a plaintiff's position falls within the *Hosanna-Tabor* exception, a variety of factors may be important, but courts are not to employ a "rigid formula" or treat the factors considered by any other court "as checklist items to be assessed and weighed against each other in every case." *Our Lady of Guadalupe*, 140 S. Ct. at 2063, 66–67. Instead, courts are required to "take all relevant circumstances into account and to determine whether [the plaintiff's position implicates] the fundamental purpose of the exception." *Id.* at 2067. By way of example, in its *Hosanna-Tabor* decision, the Supreme Court placed particular significance on the plaintiff's "role in conveying the Church's message and carrying out its mission." *Id.* (citing *Hosanna-Tabor*, 565 U.S. at 192). Although the *Hosanna-Tabor* Court also considered other

---

[8] The *Hosanna-Tabor* exception has formerly been referred to as the "ministerial exemption." *Our Lady of Guadalupe*, 140 S. Ct. at 2060–61. However, the Supreme Court has acknowledged that the term was a misnomer, as the exemption is not limited to "ministers" or other members of the clergy and that it also applies to lay persons "provided they are entrusted with carrying out the religious mission of the organization." *Id.* at 2079 n.1 (Thomas and Gorsuch, JJ., concurring).

factors (i.e. the plaintiff's job title, religious education, and the fact that she held herself out as a minister), these other factors were relevant primarily in that they "also shed light on that connection"—the plaintiff's role in conveying the Church's message and carrying out its mission. *Id.*

As the Supreme Court has recognized, courts regularly apply the *Hosanna-Tabor* exception to plaintiffs who are not "ministers" or even members of the clergy. *Our Lady of Guadalupe*, 140 S. Ct. at 2060. For example, in *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003), the Seventh Circuit applied the exception to a Hispanic Communications Manager employed by a Catholic church. Characterizing the plaintiff's position as essentially one of a "press secretary," the court found that her duties included, among other things, composing media releases and articles for publication. *Alicea-Hernandez*, 320 F.3d at 703–4. The court found these duties particularly important, as they demonstrated that the plaintiff was "integral in shaping the message that the Church presented to the Hispanic community," and "determination of whose voice speaks for the church is *per se* a religious matter." *Id.* at 704 (internal quotations omitted). In other words, the plaintiff was important in disseminating the church's message, "and a church's message, of course, is of singular importance." *Id.* Finding that the *Hosanna-Tabor* exception applied to the Hispanic Communications Manager, the court concluded that her employment claims against the church were barred. *Id.*

Other courts have also applied the *Hosanna-Tabor* exception under similar circumstances. *E.g. Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 177 (5th Cir. 2012) (finding that exception applied to Music Director where plaintiff "furthered the mission of the church and helped convey its message to the congregants"); *Schleicher v. Salvation Army*, 518

F.3d 472, 477 (7th Cir. 2008) (administrators of Salvation Army adult rehabilitation center and thrift shop); *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 802 (4th Cir. 2000) (music director); *Starkman v. Evans*, 198 F.3d 173, 177 (5th Cir. 1999) (music director); *Ross v. Metro. Church of God*, 471 F. Supp. 2d 1306, 1308, 11 (N.D. Ga. 2007) (arts and music director whose assistance in such activities as the production of CDs, videos, and other products was "important to the spiritual and pastoral mission of the church"); *Patton v. Jones*, 212 S.W.3d 541, 551 (Tex. App. 2006) (Director of Youth Ministry who was not ordained, did not teach religious classes, did not participate in worship services, was not responsible for music or liturgy, and did not assist with the confirmation of youth, but who acted as the "voice" of the youth ministry and served as a "primary agent" of the church).

In this case, there can be no genuine dispute that Plaintiff's position fell within the *Hosanna-Tabor* exception. Like the plaintiff who functioned as a type of "press secretary" in *Alicea-Hernandez*, the Plaintiff here played a vital role in shaping and disseminating the message that the church presented to its congregants and the general public. Put differently, Plaintiff played an important role in conveying the church's message and carrying out its mission. As an evangelical Christian church, Defendant's video publications are an essential part of its mission, and Plaintiff was Defendant's only video producer. [Derstine Dep. 26:21–25; P. Derstine Decl. ¶¶ 5, 12, 13; Dkt. 30 ¶ 18; Pl. Dep. 94:10–95:16, 89:18–23] As set forth in detail above, Plaintiff was responsible for the production of Defendant's religious videos from start to finish. [P. Derstine Decl. ¶ 14; Pl. Dep. 85:9–93:11, 94:10–95:16] Among other things, she directed, edited and assembled footage of Pastor Phil Derstine's sermons along with a wide variety of the Defendant's other religious activities, including its "Purpose for Life" videos for the Christian Television Network, youth church camps [Pl. Dep. 95:17–101:7, 58:5–9], mission work [*Id.* at

105:7–17], Institute of Ministry [*Id.* at 105:25–107:3], Feast of Tabernacles [*Id.* at 102:16–103:25], and Women's Conference [*Id.* at. 113:14–114:9]. In doing so, she edited and assembled the raw footage of the activity in such a way as to best convey the church's religious message in the final publication. [*Id.* at 85:9–93:11, 94:10–95:16; Derstine Decl. ¶ 14] Plaintiff even created her own commercials for the church in which she personally promoted the Defendant's church events. [*Id.* at 74:14–76:6] As the court recognized in *Alicea-Hernandez*, "a church's message, of course, is of singular importance, [and] determination of whose voice speaks for the church is *per se* a religious matter." 320 F.3d at 704 (internal quotations omitted). Plaintiff played an indispensable role in conveying the church's message. Her discrimination and retaliation claims are therefore barred by the *Hosanna-Tabor* exception, and Defendant is entitled to summary judgment in its favor.

Although not necessary for this Court's analysis, additional facts show that Plaintiff played an important role in carrying out the church's mission. When she applied for her position, she advised the church that her objective was to "support ministry endeavors and spread the Gospel." [P. Derstine Decl. Ex. B] She also stated that she believed she was a "sign to others" after having graduated from the Defendant's 10-week Institute of Ministry. [Pl. Dep. 191:22–193:4; Derstine Dep. 33:3–16] She wore a name tag identifying herself as "Media Ministry," [P. Derstine Decl. ¶ 18; Pl. Dep. 113:3–6], and she referred to herself on the Internet and in her book as being an "Able Minister" for the Defendant. [Pl. Dep. 191:2–15; Pl. Dep. Ex. 15] Playing an important and high-level role in the church, she attended bi-weekly Managers' meetings and Church Staff meetings where she helped manage the church's funds and plan the Defendant's many church events. [*Id.* at 54:1–57:13, 58:22–5921] She also helped create the church's Communications Department and attended its meetings where she assisted in planning

how the church would promote its various religious activities to its congregants and the general public.  [*Id.* at 60:16–62:17]

There is no genuine dispute of material fact that Plaintiff's position fell squarely within the *Hosanna-Tabor* exception.  As the Supreme Court has recently cautioned:

> In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition. A religious institution's explanation of the role of such employees in the life of the religion in question is important.

*Our Lady of Guadalupe*, 140 S. Ct. at 2066.  Plaintiff's responsibility for creating and conveying the Defendant's religious message and carrying out its mission is clear.  Summary judgment should be granted to the Defendant.

### C. *Plaintiff Cannot Prove a Prima Facie Case of Discrimination.*

Plaintiff cannot prove a prima facie case of discrimination under Title VII or the FCRA.[9] In order to survive summary judgment, a plaintiff alleging circumstantial evidence of discrimination must satisfy the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220 (11th Cir. 2019).  Specifically, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by proving (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job, and (4) that the defendant treated similarly situated employees outside her class ("comparators") more favorably. *Id.* at 1220–21.  If the plaintiff succeeds in proving her prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.* at 1221.  If

---

[9] The FCRA is modeled after Title VII, and decisions construing Title VII are applicable to claims under the FCRA. Accordingly, the analysis for Plaintiff's Title VII claims and FCRA claims is identical.  *Veale v. Florida Dept. of Health*, 2013 WL 5703577, at n. 2 (M.D. Fla. July 29, 2013).

the defendant meets its burden, the plaintiff must then prove that the defendant's proffered reason was a pretext for unlawful discrimination. *Id.*

With respect to the fourth element of the plaintiff's prima facie case (the need to establish comparators), the plaintiff must show that her comparators are similarly situated in all material respects. *Lewis*, 918 F.3d at 1226. Ordinarily, a similarly situated comparator will have engaged in the same misconduct as the plaintiff, been under the same supervisor, and had the same employment and disciplinary history as the plaintiff. *Id.* at 1227–28. In other words, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015)). Where a comparator *can* be distinguished, they are differently situated in material respects, and the "employer is well within its rights to accord different treatment." *Id.* at 1228.

Summary judgment is appropriate when the plaintiff fails to identify valid comparators. *E.g. West v. City of Albany, Georgia*, 2020 WL 5870246, at *6 (11th Cir. 2020) (affirming summary judgment where plaintiff failed to show that alleged comparators engaged in same conduct and had same employment and disciplinary history as plaintiff); *James v. City of Montgomery*, 823 Fed. Appx. 728, 733–34 (11th Cir. 2020) (affirming summary judgment where plaintiff failed to show that she and alleged comparator had similar disciplinary history or were disciplined by the same supervisor); *Jackson v. Blue Bird Corp.*, 792 Fed. Appx. 706, 711 (11th Cir. 2019) (affirming summary judgment where plaintiff's alleged comparator did not engage in the same conduct as plaintiff).

In this case, the Plaintiff is unable to identify a single employee who is similarly situated to the Plaintiff in all material respects but received different treatment. [Pl. Dep. 180:1–189:22] Plaintiff has not identified any comparator who also was supervised by Pastor Phil Derstine or

who also had abandoned their position for approximately three months and then had subsequent performance issues.   [*Id.*]   Accordingly, Plaintiff cannot prove a prima facie case of discrimination, and summary judgment should be granted to the Defendant.  *See West*, 2020 WL 5870246, at *6; *James*, 823 Fed. Appx. at 733–34; *Jackson*, 792 Fed. Appx. at 711.

### D.  *Plaintiff Cannot Prove a Prima Facie Case of Retaliation.*

Plaintiff cannot prove a prima facie case of retaliation under Title VII or the FCRA. To survive summary judgment, a plaintiff alleging circumstantial evidence of retaliation must satisfy the *McDonnell Douglas* burden-shifting test set forth in Section III(C) above.  *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).   Specifically, the plaintiff must first establish a prima facie case of retaliation by proving (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse employment action, and (3) that there is a causal link between the protected activity and the adverse action.  *Id.*  If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action.  *Id.*  If the defendant establishes a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual.  *Id*. at 1181–82.

An employee engages in statutorily protected activity by opposing an unlawful employment practice.[10]  *Brush v. Sears Holdings Corp.*, 466 Fed. Appx. 781, 785 (11th Cir. 2012) (citing *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 274 (2009)), *cert. denied*, 568 U.S. 1143 (2013).   A plaintiff need not engage in active, consistent opposing activities to engage in protected activity.  *Id.* (citing *Crawford*, 555 U.S. at

---

[10] An employee may also engage in statutorily protected activity by participating in an investigation, proceeding, or hearing protected under Title VII, *Brush v. Sears Holdings Corp.*, 466 Fed. Appx. 781, 785 (11th Cir. 2012), but the Plaintiff has not alleged (and cannot prove) that she was retaliated against for having engaged in such participation. Plaintiff did not file her EEOC Charge until after her termination.  [Pl. Dep. 15:3–5, 171:8–11, 204:14–16; Pl. Dep. Ex. 1]

275) (quotations omitted).   Additionally, a plaintiff still engages in protected opposition if she discloses discrimination to the defendant not on her own initiative but in response to the defendant soliciting the information.   *Id.* (citing *Crawford*, 555 U.S. at 277–78).   However, "even after *Crawford*, to engage in protected activity, the employee must still, at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred."   *Demers v. Adams Homes of Nw. Florida, Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) (internal quotations omitted), *reh'g denied*, 347 Fed. Appx. 557 (11th Cir. 2009); *Lowe v. STME, LLC*, 354 F. Supp. 3d 1311, 1316 (M.D. Fla. 2019); *Brown v. Florida Gulf Coast Univ. Bd. of Trustees*, 2018 WL 5971661, at *8 (M.D. Fla. 2018); *Arnold v. Heartland Dental, LLC*, 101 F. Supp. 3d 1220, 1227 (M.D. Fla. 2015).

A plaintiff's mere refusal to follow a supervisor's discriminatory order without stating that discrimination is occurring does not constitute protected activity.   *Lowe*, 354 F. Supp. 3d at 1316 (granting summary judgment for defendant where plaintiff refused to follow supervisor's order to cancel trip to Africa but where plaintiff did not communicate to defendant that she believed discrimination was occurring); *see also Brown*, 2018 WL 5971661, at *8 (dismissing complaint where plaintiff failed to allege she communicated her belief that discrimination was occurring); *Arnold*, 101 F. Supp. 3d at 1227–28 (same).

Plaintiff did not engage in statutorily protected activity.   By her own admission, the Plaintiff did not communicate to the Defendant that she believed any discrimination was occurring.   [Pl. Dep. 41:1–42:2; P. Derstine Decl. ¶ 45]   Specifically, in the Plaintiff's words, she only "silently resisted."   [Pl. Dep. 42:2]   This is insufficient.   The Plaintiff's silence does not constitute protected activity.   *Demers*, 321 Fed. Appx. at 852; *Lowe*, 354 F. Supp. 3d at 1316; *Brown*, 2018 WL 5971661, at *8; *Arnold*, 101 F. Supp. 3d at 1227–28.   Accordingly, Plaintiff

cannot prove a prima facie case of retaliation, and summary judgment should be granted to the Defendant.

### E. Defendant Had a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination.

Even if Plaintiff proves a prima facie case of discrimination or retaliation (which she cannot), she still cannot survive summary judgment, as Defendant had a legitimate, non-discriminatory reason for terminating her. To survive summary judgment on her discrimination and retaliation claims, Plaintiff must prove that Defendant's proffered reason for Plaintiff's termination was a pretext. *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020); *Lewis*, 918 F.3d at 1221. A reason is not pretextual unless it is shown *both* that the reason was false, *and* that discrimination or retaliation was the real reason. *Gogel*, 967 F.3d at 1136; *Jackson*, 792 Fed. Appx at 713. In other words, with respect to retaliation, the plaintiff must prove but-for causation—she must prove that had she not engaged in her alleged protected activity, she would not have been terminated. *Gogel*, 967 F.3d at 1135.

Plaintiff cannot prove pretext in this case. By her own admission, Defendant counseled Plaintiff regarding her job performance on multiple occasions. [Pl. Dep. 66:22–67:19, 70:1–23; P. Derstine Decl. ¶ 21] However, despite knowing that the Defendant was disappointed with her performance and needed her to create more videos, Plaintiff took vacation time to go to Africa. [Pl. Dep. 138:9–139:14] Despite only being approved for 10 days of vacation, Plaintiff admits she abandoned her position for approximately three months. [Pl. Dep. 143:10–14; P. Derstine Decl. ¶ 32] After being terminated and re-hired as a second chance, Plaintiff failed to report to work on time despite knowing several days beforehand that there was a technical issue that needed to be corrected in order to record the Sunday service. [Pl. Dep. 167:8–170:13; P. Derstine Decl. ¶ 37; Pl. Dep. Ex. 14; Cole Decl. ¶ 5] The technical issue was not resolved in

time, and Defendant was prevented from recording the service and transmitting a closed caption version.  [Pl. Dep. 167:8–23; P. Derstine Decl. ¶ 38]  Three days after Plaintiff's failure to report to work on time she was terminated.  [P. Derstine Decl. ¶ 39; Pl. Dep. 171:8–11, 204:14–16]  Simply put, Plaintiff would have been terminated in any case in light of her ongoing attendance and performance issues.  She cannot prove that had she not engaged in her alleged protected activity, she would not have been terminated.  As the Eleventh Circuit has recognized, "Title VII does not empower a court (or jury) to sit as a super-personnel department that reexamines an entity's business decisions."  *Gogel*, 967 F.3d at 1143 (internal quotations omitted).  Summary judgment should be granted to the Defendant.  *Id.* at 1135 (affirming summary judgment for defendant where plaintiff failed to prove pretext/but-for causation).

### F.  Plaintiff Failed to Exhaust Her Administrative Remedies on Her Retaliation Claims.

Defendant is also entitled to summary judgment on Plaintiff's retaliation claims as Plaintiff failed to exhaust her administrative remedies.

#### 1.  Plaintiff Did Not Allege Retaliation in her EEOC Charge.

As a jurisdictional prerequisite to filing suit, the plaintiff must first file a timely charge of discrimination with the appropriate agency.  *DeJesus v. Florida Central Credit Union*, 2018 WL 4610613, at *4 (M.D. Fla. 2018).  The charge must include all instances of discrimination and retaliation, and the failure to do so precludes the plaintiff from filing suit on such claims.  *Duberry v. Postmaster General*, 652 Fed. Appx. 770, 772 (11th Cir. 2016) (finding plaintiff failed to exhaust remedies where charge did not allege gender or disability discrimination); *Penazola v. Target Corp.*, 549 Fed. Appx. 844, 848 (11th Cir. 2013) (finding plaintiff failed to exhaust remedies where charge did not mention disability discrimination); *DeJesus*, 2018 WL 4610613, at *5 (same); *Houston v. Army Fleet Services, L.L.C.*, 509 F.Supp. 2d 1033, 1043

(M.D. Ala. 2007) (finding plaintiff failed to exhaust remedies on retaliation claim where plaintiff did not check retaliation box and did not otherwise mention retaliation in charge); *Buade v. Terra Group, LLC*, 259 So.3d 219, 222–23 (Fla. 3d DCA 2018) (same).

Here, the Plaintiff's EEOC Charge makes no mention of retaliation.  Plaintiff admits she did not check the box in her Charge to indicate that the Defendant had engaged in any retaliation against her.  [Pl. Dep. 15:3–16:2; Pl. Dep. Ex. 1]  She also admits she did not otherwise include any allegations of retaliation in the Charge.  [Pl. Dep. 16:17–17:6; Pl. Dep. Ex. 1]  Consequently, Plaintiff failed to exhaust her administrative remedies with respect to her retaliation claims, and Defendant is entitled to summary judgment.

Although a plaintiff can sometimes pursue a claim not specifically identified in a charge, this is only appropriate where the claim reasonably "grows out of" the charge.  *Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004).  An important factor in making this determination is the actual investigation conducted by the agency.  *See Jones v. Bank of Am.*, 985 F. Supp. 2d 1320, 1331 (M.D. Fla. 2013) (noting that FCHR's failure to mention disability discrimination in Investigative Memorandum showed that the disability claim did not reasonably grow out of plaintiff's charge); *Jacobs v. Personally Yours Services, Inc.*, 2008 WL 11335152, at *4 (N.D. Ga. 2008) ("the actual investigation triggered by the EEOC charge is the primary factor determining the permissible scope of a judicial complaint of employment discrimination").

In this case, the EEOC's Letter of Determination reveals the scope of the EEOC's investigation, where it found that Plaintiff was "ultimately discharged based on her sex/sexual orientation or perceived sexual orientation." [Dkt 30-1].  As with the Plaintiff's Charge, there is no mention of retaliation in the EEOC's Letter of Determination.  Accordingly, Plaintiff's

retaliation claim did not reasonably grow out of her Charge.   Summary judgment should be granted to the Defendant.

### 2.   Plaintiff Did Not File a Charge with the FCHR.

Plaintiff also did not exhaust her administrative remedies on her retaliation claims with the FCHR, as she did not file any charge with the FCHR.  Plaintiff alleges that with the assistance of counsel she submitted an intake questionnaire to the FCHR.  [Pl. Dep. 35:11–16; Pl. Dep. Ex. 4]  However, her intake questionnaire does not constitute a charge.

In general, an intake questionnaire is not intended to function as a charge of discrimination.  *Jones*, 985 F. Supp. 2d at 1328 (citing *Pijnenburg v. W. Georgia Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001)).   As such, courts shall "not treat intake questionnaires willy-nilly as charges."  *Id.* (citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1320 (11th Cir. 2001)).  Put differently, an intake questionnaire cannot be deemed to constitute a charge absent "exceptional circumstances."  *Shi v. Montgomery*, 679 Fed. Appx. 828, 831 (11th Cir. 2017).  Specifically, a questionnaire may only be considered a charge if (1) it was signed by the plaintiff under penalty of perjury ("verified"); (2) it contained the basic information required by a charge under 29 C.F.R. § 1601.12; and (3) the form's language could reasonably have been interpreted to represent a charge.  *Jones*, 985 F. Supp. 2d at 1328 (citing *Wilkerson*, 270 F.3d at 1320–21 (11th Cir. 2001)).   Additionally, an intake questionnaire cannot constitute a charge where other facts exist indicating that the plaintiff did not intend for the questionnaire to function as a charge.  *Prince v. Dep't of Corr.*, 2017 WL 10023750, at *7 (M.D. Fla. June 27, 2017).

Here, the FCHR questionnaire's language could not reasonably have been interpreted to represent a charge.  The questionnaire form contained the following instruction:

> SPECIAL NOTE: **If today's date is within 21 days of required final filing date** (365 days [or 300 days for dual

> filing with EEOC] from date of alleged discrimination
> stated in item 2.b), I desire to submit this questionnaire as a
> formal complaint and authorize the Commission to fill out
> a formal complaint form and send to Respondent and
> provide a copy for me to sign and return immediately upon
> receipt.

[Pl. Dep. Ex. 4 (emphasis in original)]  Thus, the questionnaire made clear that the FCHR would only treat the questionnaire as a formal charge if the questionnaire was submitted within 21 days of Plaintiff's deadline to file a charge with the FCHR.  Plaintiff's earliest possible deadline to file a charge with the FCHR was November 26, 2019 (300 days from the last alleged date of discrimination of January 30, 2019).  [*Id.*]  Plaintiff submitted the questionnaire on or about July 23, 2019—well before this date.  [Pl. Dep. 35:11–16; Pl. Dep. Ex. 4]  Consequently, it was clear to Plaintiff and her counsel that the FCHR would only treat the questionnaire as a charge if Plaintiff submitted the questionnaire on or after November 5, 2019.  Additionally, the FCHR has no record of receiving any charge from the Plaintiff, it has not responded to the Plaintiff's questionnaire, and the Plaintiff has not made any attempts to confirm that the FCHR received it.  [Pl. Dep. 45:2–46:12]  In light of the foregoing, the Plaintiff's FCHR intake questionnaire did not constitute a charge, and she therefore did not exhaust her administrative remedies with the FCHR on her retaliation claims.

### G.  *Defendant Is Not Liable for the Alleged Assault.*

Plaintiff cannot prove that Defendant is liable for the alleged assault committed by Tony and/or Daniel Bonner in the Bonner residence on August 2, 2018.  An employer may be held vicariously liable for an employee's intentional tort such as assault when the tort is committed within the scope of the employee's employment.  *Robinson v. Hill*, 2018 WL 962199, at *3 (M.D. Fla. 2018).

Plaintiff admits that neither Tony Bonner nor Daniel Bonner was an employee of the Defendant at the time of the alleged assault.  [Pl. Dep. 78:3–11, 161:12–14, 178:15–19; Derstine Dep. 36:24–37:24; P. Derstine Decl. ¶ 23]  Accordingly, Defendant cannot be held vicariously liable for their actions.  *See Robinson*, 2018 WL 962199, at *3.  Additionally, Plaintiff admits she has absolutely no proof to link Defendant with the alleged assault.  [Pl. Dep. 159:1–14]  Defendant did not instruct Tony Bonner or Daniel Bonner to engage in any of the actions alleged to have been committed on August 2, 2018, [Derstine Dep. 40:2–7; P. Derstine Decl. ¶ 24; Pl. Dep. 159:1–14], nor has Defendant received or viewed any recording they might have taken during the incident [Derstine Dep. 43:22–23; P. Derstine Decl. ¶ 25; Pl. Dep. 157:1–6, 157:22–25].  In fact, Defendant was not even aware that the incident had occurred until Pastor Ulette Song informed Defendant afterward.  [Derstine Dep. 40:2–7; P. Derstine Decl. ¶ 26]  Summary judgment should be granted to the Defendant.

### H. Defendant is Entitled to Summary Judgment as to Liability on Its Counterclaim as Plaintiff Violated the Florida Security of Communications Act by Secretly Recording her Termination Meeting and by Disclosing the Recording to the EEOC.

Defendant is entitled to summary judgment as to liability on its Counterclaim because Plaintiff violated the Florida Security of Communications Act (the "Florida Unlawful Recording Act") when she secretly recorded her termination meeting and disclosed the recording to the EEOC.  The Florida Unlawful Recording Act prohibits the recording of "oral communications" without the consent of all participants to the conversation.  Fla. Stat. § 934.03(1)(a)–(b); *Woliner v. Summers*, 796 Fed. Appx. 649, 651 (11th Cir. 2019).  Under Florida law, a statement is an "oral communication" when the speaker had a reasonable expectation of privacy, "which includes one's actual subjective expectation of privacy as well as whether society is prepared to recognize this expectation as reasonable."  *Woliner*, 796 Fed. Appx. at 651 (internal quotations

omitted).   Thus, to prevail on summary judgment, Defendant must show that (1) Plaintiff recorded oral statements of Pastor Phil Derstine and Jannette Derstine without their consent, (2) the Derstines had a subjective expectation of privacy when making the statements, and (3) their expectation of privacy was objectively reasonable—in other words—one that society is prepared to recognize as reasonable.  *See id.*

The Court may consider several factors when determining whether an expectation of privacy was objectively reasonable, including (1) the location where the communication took place, (2) the manner in which the communication was made, (3) the nature of the communication, (4) the intent of the speaker at the time the communication was made, (5) the purpose of the communication, (6) the conduct of the speaker, (7) the number of people present, and (8) the contents of the communication.  *Woliner*, 796 Fed. Appx. at 651.  The location where the communication took place is particularly significant.  *See id.* at 651–52; *Migut v. Flynn*, 131 Fed. Appx. 262, 265 (11th Cir. 2005).  Specifically, the United States Supreme Court has stated that courts should consider "'the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.'"  *Woliner*, 796 Fed. Appx. at 651–52 (quoting *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987)).  Conversations occurring inside an enclosed or secluded area are more likely to be protected.  *Woliner*, 796 Fed. Appx. at 651; *Migut*, 131 Fed. Appx. at 265.

Plaintiff violated the Florida Unlawful Recording Act.  She admits she recorded the Derstines without their consent or knowledge.  [Pl. Dep. 173:5–19; P. Derstine Decl. ¶ 44; J. Derstine Decl. ¶ 10]  Plaintiff admits the conversation took place behind closed doors in Pastor Phil Derstine's private office.  [Pl. Dep. 171:8–11, 171:18–20; P. Derstine Decl. ¶ 43; J. Derstine Decl. ¶ 9]  The Derstines had a subjective expectation of privacy when making their statements.

[P. Derstine Decl. ¶ 43; J. Derstine Decl. ¶ 9]  If there were ever an area deserving of the most scrupulous protection from government invasion, it would be a pastor's private office, especially where the illegally recorded conversation included privileged pastoral guidance and prayer.  *See Woliner*, 796 Fed. Appx. at 651–52; *Migut*, 131 Fed. Appx. at 265.  Summary judgment should be granted to the Defendant as to liability on Defendant's Counterclaim.[11]

## IV.     CONCLUSION

For the foregoing reasons, Defendant/Counter-Plaintiff, Gospel Crusade, Inc. respectfully requests this Court grant summary judgment in its favor against Plaintiff, Christie L. Nafziger. The Defendant requests any other relief this Court deems just and equitable under the circumstances.

**SHUMAKER, LOOP & KENDRICK, LLP**        -and- **CURPHEY & BADGER, P.A.**

By: /s/ *W. Jan Pietruszka*                    By:___/s/ *William E. Curphey*_____
W. JAN PIETRUSZKA, ESQ.                    WILLIAM E. CURPHEY, ESQ.
Florida Bar No. 0188794                        Florida Bar No. 386741
jpietruszka@shumaker.com                    billcurphey@gmail.com
101 East Kennedy Boulevard - Suite 2800    36181 East Lake Road – No. 383
Tampa, Florida 33602                            Palm Harbor, Florida  34685
Phone: 813-229-7600                            PH: 727-493-3841
Fax: 813.229.1660                                *Co-counsel for Defendant*
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 30, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all parties of record.

*W. Jan Pietruszka*_____
ATTORNEY

---

[11] Plaintiff also admits she intentionally disclosed her illegal recording to the EEOC. [Pl. Dep. 175:8–10]  This constitutes a separate violation of the Florida Unlawful Recording Act.  *See* Fla. Stat. § 934.03(1)(c)–(d); *Woliner*, 796 Fed. Appx. at 651.