UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**CHRISTIE L NAFZIGER,**

    **Plaintiff,**

**v.**                                                               Case No: 8:19-cv-2511-MSS-TGW

**GOSPEL CRUSADE, INC.,**

    **Defendant.**

_____

**<u>ORDER</u>**

    **THIS CAUSE** comes before the Court for consideration of Defendant's Motion for Summary Judgment, (Dkt. 40), Plaintiff's response in opposition thereto, (Dkt. 43), and Defendant's reply, (Dkt. 45); Plaintiff's Motion for Summary Judgment, (Dkt. 42), Defendant's response in opposition thereto, (Dkt. 44), and Plaintiff's reply. (Dkt. 47) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

**I.  BACKGROUND**

    The limited facts that the Parties stipulate, Plaintiff concedes, or that the Court can determine are undisputed in the record are as follows.

    Defendant Gospel Crusade, Inc. operates an evangelical Christian church with a mission "to teach Kingdom of God principles and help Christians learn how to share Christ's love, joy, and peace through the power of the Holy Spirit." (Dkt. 46 at ¶¶ 1-2)

1

As part of its mission, Gospel Crusade creates video content to spread its religious message, promote its church activities, attract new church members, and broadcast on the Christian Television Network. (Dkt. 30 at ¶ 18; Pl. Dep. at 94:10-95:16) Plaintiff Christie Nafziger started as a volunteer with Gospel Crusade. (Dkt. 46 at ¶ 4) When Plaintiff applied for employment with Gospel Crusade, she advised Gospel Crusade that her objective was to "support ministry endeavors and spread the Gospel." (Id. at ¶ 7)

Plaintiff worked for Gospel Crusade as a video producer for ten (10) years. (Dkt. 46 at ¶ 4) In her role, Plaintiff would capture raw video footage of the church's events, including its services, youth camps, Institute of Ministry, Feast of Tabernacles, and Women's Conference. (Pl. Dep. at 102:16-103:25, 105:7-107:3, 113:14-114:9) After recording the events, Plaintiff edited the footage to create videos that best promote Gospel Crusade to the church's congregation and to the general public. (Id. at 71:25-74:8, 99:11-101:7) Plaintiff also produced Gospel Crusade's weekly "Purpose For Life" videos for the Christian Television Network. (Id. at 71:25-74:8) For that program, she would record Pastor Derstine's sermon and condense it into a video that best conveyed the sermon's message. (Id.) Plaintiff spent a "significant amount of time creating the videos, working long days and sometimes all night." (Dkt. 46 at ¶ 6)

In addition to producing videos, Plaintiff served on Gospel Crusade's communications committee, whose purpose was to promote the church to the community and attract new members. (Pl. Dep. at 60:16-62:17) Plaintiff also performed accounting and other administrative services. (Dkt. 46 at ¶ 5) In that role,

2

she attended bi-weekly Managers' meetings and Church Staff meetings where she helped manage the church's funds and facilitate Gospel Crusade's many church events. (Id. at ¶ 8)

On August 22, 2017, Gospel Crusade hired Dr. Ulette Song to serve as pastor alongside Pastor Derstine. (Id. at ¶ 9) An altercation occurred between Plaintiff, Dr. Song, Tony Bonner, and Daniel Bonner on August 2, 2018. (Pl. Dep. at 154:9-156:10) The altercation was recorded by Daniel Bonner, Dr. Song's son. (Dkt. 46 at ¶ 10)

On August 22, 2018, Plaintiff requested ten (10) days of vacation time to travel with Dr. Song to Africa for a mission trip. (Pl. Dep. at 133:18–134:6) Gospel Crusade granted Plaintiff's request for time off. Plaintiff was to return to work on September 10, 2018. (Dkt. 46 at ¶ 11) On September 10, 2018, Plaintiff emailed Gospel Crusade, stating that she would not be returning to work until November and that the church could re-evaluate her employment upon her return. (Pl. Dep. at 134:16–135:15) Plaintiff did not return to United States until November 17, 2018. (Dkt. 46 at ¶ 12) Gospel Crusade terminated Plaintiff on January 23, 2019. (Pl. Dep. at 18:13-19, 223:14-20) Pastor Derstine and his wife, Jeanette Derstine, conducted Plaintiff's termination meeting. (Dkt. 46 at ¶ 13) Plaintiff recorded the termination meeting without Pastor Derstine or Mrs. Derstine's consent or knowledge. (Id. at ¶ 14)

Plaintiff filed suit against Gospel Crusade asserting six (6) counts: (i) retaliation under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") ("Count I"); (ii) retaliation under the Florida Civil Rights Act ("FCRA") ("Count II"); (iii) sex discrimination under the FCRA ("Count III"); (iv) sex discrimination under Title VII

("Count IV"); marital status discrimination under the FCRA ("Count V"); and (vi) assault ("Count VI"). (Dkts. 3, 30) Gospel Crusade answered the Amended Complaint and asserted a one-count counterclaim against Plaintiff, alleging that Plaintiff violated Florida's Security of Communications Act, Fla. Stat. §§ 934.01, *et. seq*. (Dkt. 32)

On November 30, 2020, the Parties filed cross-motions for summary judgment, seeking judgment in their favor as a matter of law. (Dkts. 40, 42) Gospel Crusade argues that Plaintiff's Title VII and FCRA claims are barred by the ministerial exception. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party must show that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court there is an absence of evidence to support the non-moving party's

4

case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e). At the summary judgment stage all facts asserted by the party opposing summary judgment must be regarded as true if supported by affidavit or other evidentiary material. Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1298 n.2 (11th Cir.1983). "[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249, 106 S.Ct. 2505 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288–289 (1968)).

5

### III. DISCUSSION

#### A. The Ministerial Exception Bars Plaintiff's Title VII Claims

There is a ministerial exception that bars certain Title VII claims.[1] The exception derives from the First Amendment. The First Amendment's religion clause ensures that, among other things, religious institutions are free "to decide matters of 'faith and doctrine' without government interference." Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2060 (2020). "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles." Id.

The ministerial exception bars all claims of discrimination under Title VII, including discrimination on the basis of sexual orientation. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 188 (2012). The exception applies regardless of whether the reason given for the employment decision was religious in nature. Id. at 194-95 ("The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone."). Notably, the exception is not limited to ordained ministers. To determine whether an employee is a minister, the Supreme

---

[1] "Because the FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework," the Court's analysis of Plaintiff's Title VII claims will be the same as its analysis of Plaintiff's corresponding FCRA claims. Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1271 (11th Cir. 2010). The ministerial exception applies to FCRA claims as well. Archdiocese of Miami, Inc. v. Minagorri, 954 So. 2d 640, 642 (Fla. 3d DCA 2007).

Court has identified four factors courts should consider: (1) the employee's "formal title" given by the church; (2) "the substance reflected in that title"; (3) "[the employee's] own use of that title"; and (4) "the important religious functions she performed" for the church. Id. at 192. These factors are not meant to be an inflexible "checklist" such that each factor must be satisfied. Our Lady of Guadalupe School, 140 S. Ct. at 2063 ("[O]ur recognition of the significance of those factors in [Hosanna-Tabor] did not mean that they must be met – or even that they are necessarily important – in all other cases."). Rather, courts must "take all relevant circumstances into account" when determining "whether each particular position implicated the fundamental purpose of the exception." Id. at 2067. "What matters, at bottom, is what an employee does." Id.

Here, the issue is whether Plaintiff falls within the scope of the ministerial exception. The Eleventh Circuit has yet to apply the ministerial exception to an employee where the employee was not an ordained minister. However, other circuits have applied the ministerial exception to an organist, Cannata v. Cath. Diocese of Austin, 700 F.3d 169 (5th Cir. 2012), a press secretary, Alicea-Hernandez v. Cath. Bishop of Chicago, 320 F.3d 698 (7th Cir. 2003), and a school principal, Fratello v. Archdiocese of New York, 863 F.3d 190 (2d Cir. 2017).

For instance, in Cannata, the plaintiff played music during services and assisted with administrative tasks. 700 F.3d at 170-71. The plaintiff argued that "he merely played the piano at Mass and that his only responsibilities were keeping the books, running the sound system, and doing custodial work," and that "he was not ordained

7

and he did not conduct Mass, deliver a sermon, or write the music or lyrics for the ceremony." Id. at 177-78. Finding "undisputed evidence . . . that music is an integral part of the celebration of Mass," the court held that the ministerial exception barred the plaintiff's claims because, "by playing the piano during services, [the plaintiff] furthered the mission of the church and helped convey its message to the congregants." Id.

In Alicea-Hernandez, the plaintiff was tasked with promoting church activities to the Hispanic community to enhance community involvement. 320 F.3d at 700. The plaintiff's duties included composing media releases for the Hispanic community and articles for church publications as well as correspondence for the Cardinal. Id. The plaintiff also translated church materials into Spanish. Id. On these facts, the court held that the plaintiff served a ministerial function for the church because she "served as a liaison between the Church and the community to whom it directed its message." Id. at 704. The court noted that, had the plaintiff "simply served in the capacity of translating the message from English to Spanish, this would be a different case." Id. at 704 n.4. Instead, the plaintiff was responsible for "crafting the message and determining how best to reach the Hispanic community." Id. In short, the plaintiff was "critical in message dissemination." Id. at 704.

With this background, the Court finds that Plaintiff's role at Gospel Crusade is akin to the plaintiffs in Cannata and Alicea-Hernandez. Plaintiff argues that she merely worked in accounting and video production, and that her tasks were not vital religious duties because she did not conduct the sermons or script the contents of her

8

videos. (Dkt. 43 at 4-5) On the other hand, Gospel Crusade contends that Plaintiff "played a pivotal role" in distributing its message to the public. (Dkt. 40 at 12) While Plaintiff performed some secular services for Gospel Crusade, the record shows that Plaintiff served an important religious function that advanced Gospel Crusade's mission.

To begin, Gospel Crusade expected Plaintiff to perform services that were vital to the dissemination of its message. While Gospel Crusade's characterization of Plaintiff's role is not dispositive, Gospel Crusade's "definition and explanation of [Plaintiff's] role is important." Our Lady of Guadalupe, 140 S. Ct. at 2066.

Gospel Crusade is an evangelical Christian church that produces video content to promote its message on its website and through its television channel, Christian Television Network. (Dkt. 30 at ¶ 18) Gospel Crusade relies on its videos to spread its religious message, promote its activities, and attract new congregants. (Pl. Dep. at 94:10-95:16) Gospel Crusade has never hired a secular production company to produce videos. (P. Derstine Dep. at 6:16-18) Prior to Plaintiff's employment, Gospel Crusade employed a "ministry producer for the television and video department," who trained and recommended Plaintiff for her role as video producer. (Id. at 6:22-7:1) Gospel Crusade explains that Plaintiff's role includes capturing "raw video footage of [Gospel Crusade's] various religious activities and using her discretion in editing and otherwise assembling the footage . . . to create new videos that best conveyed [Gospel Crusade's] religious message." (P. Derstine Aff. at ¶ 14)

9

When Plaintiff applied for a position at Gospel Crusade, she advised Gospel Crusade that her objective was to "support ministry endeavors and spread the Gospel." (Dkt. 46 at ¶ 7) Plaintiff's duties consisted of capturing raw video footage of Gospel Crusade's sermons and its various events, editing the footage, and distributing the final product to Gospel Crusade's members and to the public. (Pl. Dep. 85:9-93:11, 94:10-95:16) Plaintiff recorded all of Gospel Crusade's religious services and its events, including its Feast of Tabernacle and its Institute of Ministry program. (Id. at 102:16-103:25, 105:25-107:3) During the editing process, Plaintiff would choose images and songs and also condense sermons and other raw footage to produce a video that best appealed to the public and the members of the church. (Id. at 71:25-74:8, 99:11-101:7) After editing, Plaintiff was responsible for distributing the videos via DVDs and through Gospel Crusade's social media. (Id. at 81:22-82:3, 106:2-11) During the religious services, Plaintiff was responsible for live streaming the service on Gospel Crusade's social media. (Id. at 87:8-11) Additionally, Plaintiff produced commercials and religious content for Gospel Crusade's television channel and served on Gospel Crusade's communications committee, whose purpose was to promote the church to the public. (Id. at 60:16-62:17, 71:25-74:8) Plaintiff testified that she created videos for existing members who could not attend the sermons or events and to solicit new congregants. (Id. at 94:10-95:10). Although Plaintiff provided some accounting and administrative services to Gospel Crusade, she spent a "significant amount of time creating the videos, working long days and sometimes all night." (Dkt. 46 at ¶ 6)

In this role, Plaintiff, like the organist in Cannata, played a pivotal role in furthering Gospel Crusade's mission. As the church in Cannata looked to the organist for guidance in coordinating Mass, Gospel Crusade relied on Plaintiff to produce and spread its video ministry. Moreover, Plaintiff was not simply given video footage with detailed instructions or guidance from Gospel Crusade on how to format the final product. Instead, Plaintiff was tasked with "crafting the message and determining how best to reach" the public. Alicea-Hernandez, 320 F.3d at 704 n.4.

Plaintiff argues that she exercised limited discretion as video producer because Pastor Derstine and Jeannette Derstine would select the theme, content, and format for Gospel Crusade's annual video and the Feast of Tabernacle. (Dkt. 43-1 at ¶ 15) However, even if Plaintiff exercised limited discretion in producing certain videos, a lack of discretion, alone, does not render an employee outside the ministerial exception. See Grussgott v. Milwaukee Jewish Day Sch., Inc., 882 F.3d 655, 660 (7th Cir. 2018) ("But whether [the plaintiff] had discretion in planning her lessons is irrelevant; it is sufficient that the school clearly intended her role to be connected to the school's Jewish mission."); E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C., 213 F.3d 795, 803 (4th Cir. 2000) (even though the plaintiff was answerable to the Cathedral's Rector, who had the ultimate say over the music to be played at worship, the plaintiff played a major role in the presentation of music to the congregation and "there is no requirement that an individual have the 'final say' on spiritual matters before the ministerial exception can be applied.").

At bottom, Plaintiff performed a vital religious role in Gospel Crusade's ministry by curating and transmitting its digital message to its members and the public. Grossgott, 882 F.3d at 661 ("[T]he purpose of the ministerial exception is to allow religious employers the freedom to hire and fire those with the ability to shape the practice of their faith."); see also Sterlinski v. Cath. Bishop of Chicago, 934 F.3d 568, 570 (7th Cir. 2019) ("If the Roman Catholic Church believes that organ music is vital to its religious services, and that to advance its faith it needs the ability to select organists, who are we judges to disagree?"). This placed Plaintiff squarely within scope of the ministerial exception. Therefore, Gospel Crusade's Motion is due to be granted as to Plaintiff's Title VII and FCRA[2] claims.

### B.    The Remaining Claims

As a result of the Court granting Gospel Crusade's motion as to Plaintiff's Title VII and FCRA claims, the Court examines whether it should exercise supplemental jurisdiction over the Parties' remaining state law claims — Plaintiff's assault claim and Defendant's unlawful recording claim.

Section 1367(c) gives the court discretion to decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original

---

[2] The Court may, in its discretion, decline to exercise supplemental jurisdiction over a pendent state claim while retaining supplemental jurisdiction to decide another pendent state claim on the merits. See Espinoza v. Galardi S. Enterprises, Inc., No. 14-cv-21244-GOODMAN, 2018 WL 1729757, at *12 (S.D. Fla. Apr. 10, 2018) (collecting cases). In an exercise of its discretion, the Court has decided to retain supplemental jurisdiction over Plaintiff's FCRA claims as the Title VII and the FCRA claims are sufficiently intertwined due to similar facts, witnesses, and evidence. World Holdings, Ltd. Liab. Co. v. F.R.G., 701 F.3d 641, 651 (11th Cir. 2012); see also Mousa v. Lauda Air Luftfahrt, A.G., 258 F. Supp. 2d 1329 (S.D. Fla. 2003) (declining to exercise supplemental jurisdiction over the parties' state-law claims after granting the defendant's motion for summary judgment as to the plaintiff's Title VII and FCRA claims).

jurisdiction." 28 U.S.C. § 1367(c)(3); see Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). "Both comity and economy are served when issues of state law are resolved by state courts." Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1288 (11th Cir. 2002). "The argument for dismissing the state law claims in order to allow state courts to resolve issues of state law is even stronger when the federal law claims have been dismissed prior to trial." Id.; see also Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1296 (11th Cir. 2018) ("When all federal claims are dismissed before trial, a district court should typically dismiss the pendant state claims as well."); Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").

Here, upon consideration, the Court declines to exercise supplemental jurisdiction over the remaining claims. The remaining claims depend upon an interpretation of Florida law, specifically the applicability of its much-litigated recording laws under the Security of Communications Act, disputes which are best resolved by Florida courts. The Court also notes that the Parties will suffer no harm from the Court's decision to decline supplemental jurisdiction because federal law provides for the tolling of a state claim's statute of limitations period while it is pending in federal court and for thirty days thereafter. See 28 U.S.C. § 1367(d) (state claims asserted in federal court along with "related" federal claims "shall be tolled while the

claim is pending and for a period of 30 days after it is dismissed"); Artis v. District of Columbia, 138 S. Ct. 594, 599 (2018). Consequently, after balancing the interests of judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

### IV.  CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Defendant's Motion for Summary Judgment, (Dkt. 40), is **GRANTED IN PART** and **DENIED IN PART**.

    a. Defendant's Motion is **GRANTED** with respect to Counts I – V in Plaintiff's Amended Complaint. The Clerk shall enter judgment in favor of Defendant Gospel Crusade and against Plaintiff Christie Nafziger as to Counts I - V.

    b. Defendant's Motion is **DENIED** as to Count VI in Plaintiff's Amended Complaint and as to Defendant's Counterclaim, (Dkt. 32), which are **DISMISSED WITHOUT PREJUDICE**. In the exercise of its discretion under 28 U.S.C. § 1367(c), the Court declines to continue to exercise jurisdiction over these state-law claims.

2. Plaintiff's Motion for Summary Judgment, (Dkt. 42), is **DENIED**.

3. The Clerk is directed to **TERMINATE** any pending motions and **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida, this 18th day of October 2021.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Any Unrepresented Person